**CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
Telephone: (212) 696-6000
Facsimile: (212) 697-1559
T. Barry Kingham
Jerrold L. Bregman
Gabriel Hertzberg

*Attorneys for Steven J. Reisman as
Postconfirmation Representative of the
Chapter 11 Estates of 360networks (USA) inc., et al.*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 Cases |
| | : | |
| 360NETWORKS (USA) INC., et al., | : | Case No. 01-13721 (ALG) |
| | : | |
| Debtors, | : | (Jointly Administered) |

-----------------------------------------------------------------x

| | | |
|---|---|---|
| STEVEN J. REISMAN, AS POSTCONFIRMATION REPRESENTATIVE OF THE CHAPTER 11 ESTATES OF 360NETWORKS (USA) INC., et al., | : : : : | Adversary No. 10-_____ |
| Plaintiff, | : : | **COMPLAINT** |
| - against – | : : | |
| 360NETWORKS (USA) INC., | : : | |
| Defendant. | : | |

-----------------------------------------------------------------x

TO THE HONORABLE ALLAN L. GROPPER
UNITED STATES BANKRUPTCY JUDGE:

Steven J. Reisman, as the Postconfirmation Representative (the "Representative") of the estates (the "Estates") in the chapter 11 cases (the "Chapter 11 Cases") of 360networks (USA) inc. and its affiliated debtors (the "Debtors"), alleges for his Complaint as follows:

**Introduction**

1. This is an action on behalf of the Estates for restitution of funds in the amount of $16,087,000 advanced in error by the Estates to 360networks (USA) inc. ("360"), the reorganized Debtors in the Chapter 11 Cases, in September and November 2008 (the "Advances"). The Advances were paid to 360 by the Official Committee of Unsecured Creditors of the Debtors (the "Committee"), acting on behalf of the Estates. The Committee and 360 both believed, at the time the Committee authorized the Advances, that the Estates held more than $50 million in a trust account safeguarded by the Committee's former counsel, Dreier LLP, to be apportioned between the general unsecured creditors of the Debtors and 360 pursuant to a formula set forth in the First Joint Plan of Reorganization [Docket No. 1175] (as modified and confirmed [Docket No. 1337], the "Plan," attached as **Exhibit A**)), which Plan was confirmed by Order of this Court, as described below.

2. The Committee and 360 were mistaken. The funds that they believed were being safeguarded by Dreier LLP – amassed from the prosecution of certain preference actions (the "Committee Claims," as defined in the Plan) – had in fact been stolen by the firm's managing partner, Marc S. Dreier, months before the Advances were made. Dreier secretly stole the funds to support a fraudulent scheme in which he sold counterfeit promissory notes to investors. Dreier's crimes were discovered upon his arrest in December 2008. Dreier pleaded guilty to his crimes in May 2009 and was sentenced to a 20-year term of imprisonment, which he is now serving.

3. The Committee would not have authorized the Advances to 360 had it known that Marc Dreier had stolen the Committee's funds. As a result of Dreier's theft and the Advances, the general unsecured creditors of the Debtors – *i.e.*, the Allowed Class 7 Claim holders defined in the Plan (the "Unsecured Creditors") – did not receive their proportional share

of the distributions to which they were entitled under the Plan. The receipt of the outsize Advances by 360, therefore, resulted in an inequitable and unjust enrichment of 360 at the expense of the Unsecured Creditors. Restitution of the Advances to the Estates, for allocation among 360 and the Unsecured Creditors in accordance with the Plan, is warranted.

## Parties

4. Pursuant to Orders dated December 17 and 23, 2008 [Docket Nos. 1997 and 1998, respectively], this Court directed the Representative to investigate the disappearance of the Committee's funds and to pursue with Court approval claims relating to those funds. By Order dated February 1, 2010 [Docket No. 2045], this Court authorized the Representative to commence this Adversary Proceeding. The Representative maintains a business address at the law offices of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178.

5. 360 is a closely-held corporation organized under the laws of Delaware. It is headquartered in Seattle, Washington.

## Jurisdiction and Venue

6. This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

7. Venue is proper pursuant to 28 U.S.C. § 1409.

8. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105(a), 541 and 1142.

## Background

**The Plan**

9. On August 19, 2002, the Debtors and 360networks (Holdings) ltd. filed the Plan, which this Court confirmed by Order entered on October 1, 2002 [Docket No. 1337]. 360 was reorganized pursuant to the Plan.

10. Pursuant to the Plan, the Committee was authorized to prosecute Committee Claims on behalf of the Estates. Under the Plan, the proceeds of the Committee Claims (together with accrued interest, the "Preference Recoveries") were to be safeguarded in a segregated escrow or trust account (the "Preference Account"). After payment of professional fees and expenses incurred in the prosecution of the Committee Claims, the remaining Preference Recoveries (the "Net Preference Recoveries," as defined in Plan § 1.52, or "NPR") were to be distributed to the Unsecured Creditors and to 360 pursuant to a formula specified in the Plan (the "Committee Recovery Percentage"). (Plan §§ 1.23 & 4.3(c)). Pursuant to the Committee Recovery Percentage formula, the Estates were entitled to 85 percent of the first $30 million of NPR, and to 80 percent of NPR over $30 million. (Plan § 1.23). 360 was entitled to "the remainder" of the NPR, *i.e.*, 15 percent of the first $30 million and 20 percent of NPR over $30 million. (Plan § 4.3(a)).

11. Under the Plan, 360 was entitled to receive its share of NPR "on or before the date that any of the Committee Recovery Percentage of the Net Preference Recoveries are distributed to holders of Allowed Class 7 Claims." (Plan § 4.3(c)).

12. The Plan directs that 360 serve as disbursing agent for making distributions of NPR to the Unsecured Creditors on behalf of the Estates. (Plan § 5.1(a)).

13. The Plan directs that Preference Recoveries be deposited into a Preference Account, defined in the Plan as "an escrow or trust account maintained by and under the sole and exclusive control of the Committee." (Plan § 1.64).

14. At all relevant times, the Preference Account was under the ostensible control of Dreier LLP in its capacity as counsel for the Committee.

15. At all relevant times, 360 was an *ex officio* member of the Committee, and was involved in substantially all relevant Committee matters.

16. The Plan directs that 360 "shall have the right to audit the Preference Account" and that "the Committee promptly shall provide [360] with copies of the monthly statements for the Preference Account." (Plan § 4.3(c)).

**360's Acquisition of the Allowed Class 7 Claim
of CapRock Communications, Inc.**

17. CapRock Communications, Inc. ("CapRock") was an unsecured creditor of the Debtors with an Allowed Class 7 Claim in the amount of $23,500,000 (the "CapRock Claim"), or approximately 10 percent of the total amount of allowed Class 7 Claims. In October 2003, CapRock assigned its claim to 360.

18. As consideration for assignment of the CapRock Claim, 360 agreed to assume certain pre-petition contracts between 360 and certain CapRock affiliates.

**Marc Dreier's Theft Of The Estates' Preference Recoveries**

19. Commencing in October 2003, Preference Recoveries obtained by the Committee were received by Dreier LLP and deposited into and held in an account at J.P. Morgan Chase Bank, N.A. ("Chase"), denominated "ECF—Official Committee of Unsecured" (the "Committee Account"). Marc Drier was the sole signatory on the Committee Account (like

-5-

all of the firm's bank accounts) and only Marc Dreier had authority to move funds in and out of the Committee Account.

20. Prior to July 2007, Preference Recoveries in the amount of approximately $8 million were deposited into the Committee Account and were expended almost entirely on fees and expenses of Dreier LLP and other professionals providing services to the Committee.

21. In July 2007, the Committee settled a preference action against Nortel Networks Limited for approximately $45.5 million (the "Nortel Funds"). The Nortel Funds were deposited into the Committee Account on July 25, 2007.

22. In November 2007, Norman Kinel, the lead partner at Dreier LLP on the 360 matter, sought authorization from 360 to move the Preference Recoveries from the Committee Account to a six-month certificate of deposit ("CD") at Wachovia Bank, N.A. ("Wachovia") in order to earn a higher rate of interest. On November 12, 2007, 360 authorized Kinel to transfer the Preference Recoveries to the Wachovia CD.

23. On October 18, 2007, however – weeks before 360 authorized the transfer to Wachovia – Marc Dreier had already moved the Preference Recoveries to a non-escrow, non-trust, account at Wachovia, in the name of Dreier LLP, bearing the last four digits 1879 and titled "Dreier LLP Special Account" (the "Wachovia 1879 Account").

24. On October 30, 2007, Marc Dreier transferred $30 million of the Preference Recoveries out of the Wachovia 1879 Account to a different Wachovia account ending in 1537 and titled "Dreier LLP" (the "Wachovia 1537 Account"). Those funds were quickly converted by Dreier to pay operating expenses of the firm, to purchase art and other luxury items for Dreier, and to support the promissory note fraud scheme to which he later

pleaded guilty. Dreier converted and transferred the remaining $15 million of Preference Recoveries out of the Wachovia 1879 Account by late December 2007.

25. All Preference Recoveries that were subsequently obtained by the Committee and entrusted to Dreier LLP – including $9.9 million received from Sycamore Networks, Inc. in three equal installments in October 2007, January 2008 and April 2008, respectively – were stolen by Dreier after their deposit into the firm's accounts at Chase and Wachovia, except for a small percentage which was used to pay professional fees and expenses of the Committee.

**The First Advance to 360**

26. Beginning in April 2008, 360 began asking Kinel for an advance of 360's 15 percent share of the first $30 million of the NPR that 360 believed was being held by Dreier LLP, *i.e.*, $4.5 million.

27. In an e-mail dated September 3, 2008, Kinel sought authorization from the Committee members for the advance. In that e-mail, Kinel wrote:

> 360 has requested that we distribute $4.5 million to it from the preference account that we maintain on the Committee's behalf (***and which currently holds over $54 million***) as a first installment of the distribution to which it is entitled under the Plan.
> As you recall, 360 is entitled to receive 15% of the first $30 million in Net Preference Recoveries (as defined in the Plan) and 20% of any Net Preference recoveries in excess of $30 million. Since the Net Preference Recoveries we are holding exceed $30 million *by over $20 million* [emph. in original], there can be no doubt that 360 is entitled to a full 15% of $30 million, which equals the $4.5 million they are requesting....
> It is currently estimated that distributions to general unsecured creditors (and the remaining amount due to 360) will be made in the middle of October (as a result of the Court having established deadlines for creditors to provide their tax ID numbers to 360). Therefore, in effect, 360 is asking that a portion of the distribution to which it is entitled under the Plan be *accelerated* by approximately six weeks. My recommendation is that we agree to 360's request in this regard.

(Emphasis supplied except where noted.)

28. The Committee members approved Kinel's request for the advance. At that time, the Committee members believed (as they were advised by Kinel in his September 3 e-mail) that (i) more than $54 million of Net Preference Recoveries was safely on deposit and being held in the Preference Account and (ii) that the distribution to 360 was merely an "accelera[tion] by approximately six weeks." The Committee and Kinel were mistaken. Due to Dreier's thefts, there were no Net Preference Recoveries on deposit at the time of 360's request for an advance.

29. On September 3, 2008, believing the Committee Account held in excess of $54 million, Kinel requested that Marc Dreier cause funds in the amount of $4.5 million to be sent by wire to 360. In fact, the Committee Account held virtually no Net Preference Recoveries.

30. On September 8, 2008, to comply with the Committee's request for payment of the advance to 360, Marc Dreier restored $4.5 million to the Committee Account from other sources. He then caused a wire transfer in the amount of $4.5 million to be sent from the Committee Account to 360's bank account at Wells Fargo to fulfill what the Committee believed, mistakenly, to be its obligation to 360.

**The Second Advance to 360**

31. On November 13, 2008, 360 asked Kinel for a second advance distribution from the Estates. 360 sought an advance of (i) 20 percent of Net Preference Recoveries greater than $30 million (pursuant to the Committee Recovery Percentage formula) and (ii) amounts payable to 360 in respect of the general unsecured Caprock claim it acquired in October 2003.

32. On November 14, 2008, Kinel sent an e-mail to the Committee members, requesting authorization to pay 360's requested advance from NPR he believed was held by Dreier LLP in the Committee Account. He wrote:

> 360 has requested that it receive a second *advance* on its distribution of Net Preference Recoveries this coming Monday. (You will recall that we previously advanced $4.5 million to 360 a while ago). Because the numbers will continue to change until all of the funds are withdrawn from our account (due to accruing interest, the malpractice settlement and some additional unpaid fees and expenses of our firm), we do not know what 360's exact distribution will be, but estimate that, after taking into account the $4.5 million that they have already received, they will be entitled to an additional approximate $12.9 million (please recall that 360 has both it's [*sic*] carve out claim as well as the $23.5 million unsecured claim that it holds as a result of its settlement with [Caprock]).
> Accordingly, pursuant to 360's request, we wish to know whether you have any objection to *our transferring* $11.9 million to 360 on Monday, which will result in 360 leaving behind – for the moment – approximately $1 million to which it will still be entitled when the entire distribution is made.
> Please let me know by noon on Monday if you have an objection to our taking this action as requested by 360.

(Emphasis supplied).

33. The Committee approved Kinel's request for the advance, believing that the payment was merely an "advance" and that all Net Preference Recoveries continued to be safely held by Dreier LLP. The Committee and 360 were mistaken – there were no Net Preference Recoveries on deposit at that time due to Marc Dreier's thefts.

34. On or about November 17, 2008, Kinel requested that Dreier cause funds in the amount of $11.9 million to be sent to 360 from what Kinel believed were the NPR held by Dreier LLP.

35. On November 17, 2008, to comply with the Committee's request for payment of the second advance to 360, Dreier caused a wire transfer in the amount of $11.9

million from a Dreier LLP general escrow account at Chase to 360's account at Wells Fargo. The second advance was funded from sources other than Net Preference Recoveries.

36.  Of the $11.9 million advanced to 360 on November 17, 2008, approximately $5.9 million was paid in respect of the CapRock Claim. In addition, $313,000 was paid in respect of Requested Debtor Fees (as defined in the Plan), to which 360 was entitled and as to which the Representative does not seek restitution.

**Marc Dreier's Arrest**

37.  Marc Dreier's fraud was discovered in December 2008. By that time, no Preference Recoveries were held in any of Dreier LLP's accounts, even though $38,596,355 should have been on deposit in early December 2008, after accounting for the Advances and distributions and fees Dreier paid on behalf of the Estates.

38.  At no time from July 2007 through December 2008 did 360 assert its rights under section 4.3(c) of the Plan to audit the Preference Account or to receive monthly statements of the Account.

## COUNT I

### (Money Paid By Mistake)

39.  The Representative repeats and re-alleges each and every allegation set forth in the preceding paragraphs.

40.  The Committee authorized the Advances to 360 because it believed that more than $50 million of Net Preference Recoveries was safeguarded in the Preference Account for eventual distribution to the Unsecured Creditors and 360 pursuant to the Committee Recovery Percentage formula.

41.  The Committee was mistaken regarding the amount of Net Preference Recoveries held for the Estates' benefit at the time of the Advances. In fact, the total Net

-10-

Preference Recoveries held by Dreier LLP at the time of each Advance was only that amount Marc Dreier restored for the Estates' benefit in order to effect the Advances.

42. The Committee distributed the Advances to 360 by mistake. Had the Committee known that Marc Dreier stole the Net Preference Recoveries, the Committee would not have authorized the Advances to 360.

43. 360 has not changed its position to its detriment in reliance on the mistaken payment.

44. Equity and good conscience require restitution of the Advances. The Advances inequitably enriched 360 relative to the Unsecured Creditors. 360 and the Unsecured Creditors were both entitled to share Net Preference Recoveries pursuant to the Committee Recovery Percentage formula, but instead, 360 received an outsize distribution relative to the formula, while the Unsecured Creditors received nothing.

45. As for the portion of the second advance allocable to 360's Caprock claim, *i.e.*, approximately $5.9 million, 360's retention of that amount is also inequitable because it affords a priority to that Class 7 Claim over other similarly situated Class 7 Claims, which is contrary to the letter and spirit of the Plan.

46. Accordingly, restitution of the Advances is warranted, and 360 and the Unsecured Creditors should share in the restored amounts pursuant to the Committee Recovery Percentage formula.

## COUNT II

### (Money Had And Received)

47. The Representative repeats and re-alleges each and every allegation set forth in the preceding paragraphs.

48. The Committee authorized the Advances to 360 because it believed that more than $50 million of Net Preference Recoveries was safeguarded in the Preference Account for eventual distribution to the Unsecured Creditors and 360 pursuant to the Committee Recovery Percentage formula.

49. The Committee was mistaken regarding the amount of Net Preference Recoveries held for the Estates' benefit at the time of the Advances. In fact, the total Net Preference Recoveries held by Dreier LLP at the time of each Advance was only that amount Marc Dreier restored for the Estates' benefit in order to effect the Advances.

50. The Committee distributed the Advances to 360 by mistake. Had the Committee known that Marc Dreier stole the Net Preference Recoveries, the Committee would not have authorized the Advances to 360.

51. 360's receipt of the Advances benefited 360 to the extent 360 received a greater percentage of the restored NPR balance than it was entitled pursuant to the Committee Recovery Percentage formula.

52. Equity and good conscience require restitution of the Advances. The Advances inequitably enriched 360 relative to the Unsecured Creditors. 360 and the Unsecured Creditors were both entitled to share Net Preference Recoveries pursuant to the Committee Recovery Percentage formula, but instead, 360 received an outsize distribution relative to the formula, while the Unsecured Creditors received nothing.

53. As for the portion of the second advance allocable to 360's Caprock claim, *i.e.*, approximately $5.9 million, 360's retention of that amount is also inequitable because it affords a priority to that Class 7 Claim over other Class 7 Claims, which is contrary to the letter and spirit of the Plan.

54. Accordingly, restitution of the Advances is warranted, and 360 and the Unsecured Creditors should share in the restored amounts pursuant to the Committee Recovery Percentage formula.

## COUNT III

### (Unjust Enrichment)

55. The Representative repeats and re-alleges each and every allegation set forth in the preceding paragraphs.

56. The Committee authorized the Advances to 360 because it believed that more than $50 million of Net Preference Recoveries was safeguarded in the Preference Account for eventual distribution to the Unsecured Creditors and 360 pursuant to the Committee Recovery Percentage formula.

57. The Committee was mistaken regarding the amount of Net Preference Recoveries held for the Estates' benefit at the time of the Advances. In fact, the total Net Preference Recoveries held by Dreier LLP at the time of each Advance was only the amount Marc Dreier had restored for the Estates' benefit in order to effect the Advances.

58. The Committee distributed the Advances to 360 by mistake. Had the Committee known that Marc Dreier stole the Net Preference Recoveries, the Committee would not have authorized the Advances to 360.

59. 360's receipt of the Advances benefited 360 to the extent 360 received a greater percentage of the restored NPR balance than it was entitled pursuant to the Committee Recovery Percentage formula.

60. The Advances were paid at the expense of the Unsecured Creditors. Had the Committee not authorized the Advances, the advanced funds could have been distributed to 360 and the Unsecured Creditors pursuant to the Committee Recovery Percentage formula.

61. Equity and good conscience require restitution of the Advances. The Advances inequitably enriched 360 relative to the Unsecured Creditors. 360 and the Unsecured Creditors were both entitled to share Net Preference Recoveries pursuant to the Committee Recovery Percentage formula, but instead, 360 received an outsize distribution relative to the formula, while the Unsecured Creditors received nothing.

62. As for the portion of the second advance allocable to 360's Caprock claim, *i.e.*, approximately $5.9 million, 360's retention of that amount is also inequitable because it affords a priority to that Class 7 Claim over other similarly situated Class 7 Claims, which is contrary to the letter and spirit of the Plan.

63. Accordingly, restitution of the Advances is warranted, and 360 and the Unsecured Creditors should share in the restored amounts pursuant to the Committee Recovery Percentage formula.

### **Prayer for Relief**

WHEREFORE, the Representative respectfully requests that the Court enter an order granting the following relief as to each cause of action:

(a) judgment of restitution in favor of the Representative and against 360 in an amount not less than $16,087,000, plus interest accruing from and after the date each Advance was received by 360;

(b) awarding to the Representative his costs and attorney's fees for bringing and prosecuting this action; and

(c) granting such other and further relief as the Court deems just and proper.

Dated: February 1, 2010

                              **CURTIS, MALLET-PREVOST,**
                                 **COLT & MOSLE LLP**

                    By:  */s/ T. Barry Kingham*
                          T. Barry Kingham
                          Jerrold L. Bregman
                          Gabriel Hertzberg
101 Park Avenue
New York, New York  10178
(212) 696-6000

*Attorneys for Steven J. Reisman as Postconfirmation*
*Representative of the Chapter 11 Estates of*
*360networks (USA) inc., et al.*

-15-

6635855